## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FIRETREE, LTD,** | : | **CIVIL ACTION NO. 1:08-CV-0245** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JAMES CREEDON,** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

Presently before the court is the motion (Doc. 2) of plaintiff Firetree, LTD

("Firetree") for preliminary injunctive relief.  Firetree leases several buildings from

the Pennsylvania Department of General Services ("DGS") where it administers

correctional and substance abuse treatment programs.  Firetree seeks to enjoin

defendant James Creedon ("Creedon"), Secretary of DGS, from refusing to renew

the lease agreement for these buildings.  Firetree contends that DGS is refusing to

renew the lease in retaliation for a Board of Claims action filed by Firetree over

disputed lease terms.  Firetree alleges that DGS's action violates its First

Amendment right to petition the government for redress of grievances.  DGS

responds that Firetree's legal action played no part in the non-renewal decision and

that it needs the space to house organizations unaffiliated with Firetree.  For the

following reasons, Firetree's motion for preliminary injunctive relief will be denied.[1]

---

[1]The following discussion shall constitute the court's findings of fact and
conclusions of law for purposes of Rule 52(a)(2) of the Federal Rules of Civil
Procedure.

I.   **Factual Background**

Firetree is a non-profit organization that operates community corrections centers and substance abuse facilities for inmates and indigent individuals throughout eastern and central Pennsylvania.  (Doc. 23 at 18, 53-55.)  The Federal Bureau of Prisons, the Pennsylvania Department of Corrections, and county correctional institutions refer inmates to Firetree for substance abuse treatment and transitional pre-release programs.  (Id. at 18-19.)

One of Firetree's facilities is located in Wernersville, Pennsylvania, where it leases space on the grounds of the Wernersville State Hospital (hereinafter "the Wernersville Hospital" or "the State Hospital").  The State Hospital is owned by the Pennsylvania Department of Public Welfare ("DPW"), which periodically arranges with DGS to offer unused buildings for lease to private entities.  DGS is a state agency that, *inter alia*, performs realtor-like functions for other state agencies such as DPW that have unused property to sell or lease.[2]  DGS negotiates and executes all leases associated with these transactions.  (Id. at 204-06.)

---

[2]See 71 PA. STAT. ANN. § 932(i) ("The Department of General Services shall have the power . . . [t]o rent to individuals . . . such real estate, owned by the Commonwealth, as is not being used in connection with the work of any department . . . .").

A.      **The Contractual Dispute Between Firetree and DGS**

Firetree executed its current Wernersville lease with DGS on March 22, 2004. (Preliminary Injunction Hearing [hereinafter "Hr'g"] Ex. P-1 recitals para. 1.)[3]  The lease, which has a four-year term, supercedes and consolidates at least two prior rental agreements between DGS and Firetree.  (Id. ¶ D.1; Doc. 23 at 175-76.)  It also requires Firetree to pay two forms of rent.  (Hr'g Ex. P-1 ¶ A.1.) The first, identified as general rent, grants Firetree possessory rights to use and occupy the leased premises.  General rent is payable directly to DGS in the amount of $3.25 per day for each resident housed.  (Id. ¶¶ A.1, A.2.)  The lease permits Firetree to make improvements to the demised buildings and to offset the cost thereof against general rent payments in cumulative amounts of up to $1.6 million.  (Id.)  The second, identified as operating rent, covers the costs of utilities provided to Firetree.  (Id. ¶ A.4.)  The lease obligates DPW to furnish "electricity, steam heating, water, sewer, and grounds keeping" through DPW-controlled infrastructure on the State Hospital campus.  (Id.)  Firetree's operating rent payments are $18,000 per month and are payable directly to DPW.  (Id.)

---

[3]All exhibits cited in this format refer to documents introduced by the parties at the preliminary injunction hearing held on March 27 and April 15, 2008.

Pursuant to a prior lease agreement,[4] Firetree has occupied one of the buildings, known as Building 30, since at least 2001 and has performed numerous repairs. (Doc. 23 at 31.) Building 30 was vacant prior to Firetree's tenancy and had been declared an environmental hazard due to asbestos contamination. (Id. at 30.) It originally included a steam heating system; however, Firetree's renovations revealed that the building's steam tunnels had collapsed. (Id. at 63.) Firetree installed gas heat to replace the unfunctional steam heat system. (Id. at 64.) The cost of gas heat typically runs between $3,000 and $5,000 per month. (Id.)

A dispute over heating expenses arose during the summer of 2006, when Firetree realized that DPW was not covering the costs of the gas heat. (Id.) Firetree believed that the lease obligated DPW to cover these costs because Building 30 was disconnected from the campus steam system. It began withholding operating rent in July 2006 to recoup its past heating costs. (Id. at 64-65; Hr'g Ex. P-4.) In October 2006, Firetree received a letter from Bradley Swartz ("Swartz"), who is chief of the Land Management Division within DGS.[5] (Hr'g Ex. P-4.) The

---

[4]This earlier lease agreement was identified during the testimony of Allen Ertel ("Ertel"), who is chairman of Firetree's executive committee, but was never placed into evidence. (Hr'g Ex. D-11; Doc. 23 at 154, 175.) The court references it here solely for the purpose of establishing the chronology of certain background facts.

[5]Swartz received notice of the rental dispute in an email from DPW's chief operating officer of the Wernersville Hospital, which stated:

> I am advising of and seeking direction towards addressing Firetree Ltd's lease payment delinquency.

letter stated that Firetree owed the State Hospital $72,000 in unpaid operating rent

and that DGS would terminate the lease if the balance remained unpaid.  (Id.)

_____

\* \* \* \*

    [Firetree's financial manager has] informed me that the basis
for the [withheld operating rent] was Firetree's presumption that the
utility cost that was used in the formulation of the operating rent
included the provision of heat to Building 30.
    I informed [Firetree's financial manager] that [the] operating
rent calculation . . . did not include the provision of heat to Building 30
in that the building had been retrofitted for gas heat prior to
reopening.

\* \* \* \*

    I [later met with Firetree's liaison at the State Hospital] and
explained the background of the utility cost, providing him with a copy
of the formula applied in calculating the 2003 utility cost apportionment.
He acknowledged after reviewing the formula[,] which provides separate
calculations for developing prorated electric, sewer and heat costs, that
there was a lower multiplier used (equal to the reduction for the square
footage of Building 30) to establish heating costs attributable to the
Firetree lease.
    He called Mr. Ertel from my office and explained that he had
confirmed the calculation used a different basis for establishing heat
related costs in comparison to the formula used for electric and sewer.
The feedback that [Firetree's liaison] provided to me is that Mr. Ertel
contends that the $18,000 utility cost was intended, when originally
established, to apply to the hospital's provision of all utilities to the
buildings that comprise the lease.  He also indicated that Mr. Ertel
believes it appropriate for Firetree to recoup a prorated cost of
providing heat to Building 30. . . .
    Unless there is background of which I am not aware to support
Mr. Ertel's contention/position, I am seeking assistance/intervention in
collecting utility costs that are rightfully due our hospital.

(Hr'g Ex. P-2 at 3-4.)

Negotiations over the disputed rent followed with Daniel Schranghamer ("Schranghamer"), general counsel for Firetree, and Gary Ankabrandt ("Ankabrandt"), deputy chief counsel for DGS, attempting to reach a resolution. (Doc. 23 at 197; Doc. 30 at 176-78.)  During a series of telephone calls, the parties agreed that Swartz's letter overestimated the amount in dispute and that the correct amount was approximately $48,000.  (Doc. 30 at 205.)  Firetree suggested that the dispute be jointly submitted to the Pennsylvania Board of Claims[6] for resolution.  (Id. at 177.)  Ankabrandt declined the invitation and reiterated DGS's position that the lease covered only steam heating.  (Id. at 179, 206.)  He informed Schranghamer that the dispute reflected a potential ambiguity in the utility provisions of the lease and stated that any Board of Claims action by Firetree would confirm the parties' disagreement over the operating rent clause.  (Id. at 179, 181-83.)  He also notified Schranghamer that DGS would be unwilling to renew the lease in a form that contained such an ambiguity, though DGS might be willing to renegotiate the lease terms.  (Id.)  If, however, Firetree refrained from submitting a Board of Claims action, DGS would interpret Firetree's forbearance as an adoption of DGS's interpretation of the lease.  (Id. at 181-82.)  DGS would then consider renewing the lease without modification because the parties would have agreed upon the proper interpretation of the operating rent clause.  (Id.)  On November 22,

---

[6]The Pennsylvania Board of Claims is an administrative entity that has jurisdiction to arbitrate contract claims to which the Commonwealth of Pennsylvania is a party.  See 62 PA. CONS. STAT. § 1724.

2006, Ankabrandt memorialized his discussions with Schranghamer, albeit

somewhat unartfully,[7] in a letter stating, in pertinent part:

> The Operating Rent covers [DPW's] costs and expenses in providing
> electricity, steam heating, water, sewer, and grounds keeping.  No
> portion of this amount was intended to cover natural gas heating for
> Building No. 30. . . .

> \* \* \* \*

> *If . . . Firetree does seek relief from the Board of Claims* on [the
> heating] issue, *such action will be a serious factor in the
> Commonwealth's decision as to whether the least should be renewed*
> beyond the March 2008 expiration date.

-----------------------

[7]He testified as follows regarding the content of the letter and his concern
that the utility provisions of the lease were ambiguous:

> Q.   Why did you put that language [stating that a Board of Claims action
> would be "a serious factor" in the renewal decision] in the letter?
>
> A.   I put that in the letter because if [Firetree] continued to dispute this
> provision in the lease by taking it to the Board of Claims, then that's
> going to have a decision [sic] as to whether or not we renew the lease
> or don't renew the lease, because the lease was scheduled to expire in
> March 2008.
>
>     If we were to renew it we continue with the same terms and
> conditions, meaning we have an ambiguity here with regard to
> operating rent and steam heat to the building.  That's going to
> continue then for the new lease term.  So I guess you could really look
> at this as capping any potential damages.
>
>     This is the damage, if there was a judgment against [DGS] at the
> Board of Claims, we know it would be capped as of March of 2008.
> Damages wouldn't continue to increase after March of 2008.  If, in fact,
> [Firetree] accepted our provision—didn't file with the board—then we
> assumed that both parties are in agreement as to the interpretation of
> the clauses[,] and that should not be a factor then in regard to
> renewing or not renewing the lease.

(Doc. 30 at 181-82.)

7

(Hr'g Ex. P-5.)  Ankabrandt forwarded the letter to Swartz, who reviewed it before

it was sent to Schranghamer.  (Doc. 30 at 180.)  Ankabrandt has no decision-making

authority with regard to lease renewals.  (Doc. 23 at 223.)

Firetree commenced an action with the Board of Claims on January 9, 2007.[8]

(Doc. 23 at 110; Hr'g Ex. P-6 at 2.)  DGS received notice of the claim on January 18.

(Hr'g Ex. P-6 at 2.)  On January 22 Ankabrandt sent the following email to Swartz

and Joanne Phillips ("Phillips"), who is Swartz's supervisor:

> Since there is a difference of opinion in regard to the interpretation of
> the lease, I recommend that DGS immediately send notice to Firetree
> that the lease will NOT be renewed when it expires next year and *any
> newly-negotiated [sic] lease* for the premises will not only ensure that
> DPW is totally reimbursed for its costs associated with the Firetree
> lease of the premises but will include a reasonable rental payment as
> well.

(Id. at 1 (emphasis added)).  Phillips, who has authority to decide whether to renew

Commonwealth leases, determined that DGS would not renew the ambiguous lease.

(Doc. 23 at 229; Doc. 30 at 217-18.)  She did not eliminated the possibility of

negotiating a new lease that resolved the ambiguity.  (Doc. 23 at 217-18.)  Swartz

---

[8]The precise date on which Firetree filed its action with the Board of Claims
was alleged in the amended complaint but was not referenced during testimony at
the preliminary injunction hearing.  (Doc. 4 ¶ 30.)  The Board of Claims docket,
which is publicly available on the Board's website, verifies that Firetree
commenced its claim, which is No. 3870, on January 9, 2007.  See Firetree, Ltd. v.
Commonwealth of Pa. Dep't of Gen. Servs., No. 3870, (Pa. Board of Claims),
available at http://www.boc.state.pa.us/; see also (Doc. 30 at 260; Hr'g Ex. P-13 ¶ 15.)
The court takes judicial notice of this docket for purposes of the pending motion.
See FED. R. EVID. 201(d); Cooper v. Pa. State Att'y Gen., No. 2:06cv1332, 2007 WL
2492726, at *2 (W.D. Pa. Aug. 30, 2007) (stating that a federal court may take judicial
notice of state court records and dockets).

informed Ankabrandt that he and Phillips had "discussed this issue[,] and we are
going to follow your recommendation" that Firetree's lease be permitted to expire
to alleviate the ambiguity in the utility provisions. (Hr'g Ex. P-6 at 1.)

Phillips and Swartz informed Creedon of their decision during a late-
February 2007 meeting held with personnel from both DGS and DPW. (Doc. 23 at
213; Doc. 30 at 217-19.) Creedon convened the meeting to discuss the pending sale
of DPW property near Philadelphia that was hindered by the presence of a tenant
unrelated to Firetree. (Doc. 23 at 208-09.) DPW wished to relocate the tenant prior
to the sale of the property. (Id. at 282-83.) Phillips and Swartz suggested that DGS
allow Firetree's lease to expire and offer the Wernersville Hospital site to the

tenant.[9]  (Doc. 30 at 217-19.)  Officials from DGS and DPW assented to their

suggestion, and Swartz transmitted a notice of non-renewal to Firetree in

accordance with Firetree's lease on May 24, 2007.  (Hr'g Ex. P-7; see also Hr'g Ex. P-

1 ¶ D.1)

### B.   DGS and DPW's Avowed Plans for the Wernersville Hospital

The potential tenant, identified during the February 2007 meeting as a

replacement for Firetree, is VisionQuest.  VisionQuest is a for-profit entity that

operates juvenile justice and rehabilitation programs.  (Doc. 23 at 268.)  Since at

least 1994, it has leased space at the Embreeville State Center (hereinafter "the

_____

[9]Phillips testified about her decision-making process between January 22,
2007, when she received Ankabrandt's email, and late-February, when she met with
Creedon:

Q.   And what was your discussion with Mr. Swartz [with regard to
Ankabrandt's January 22 email]?
A.   Our discussion concerned that the lease had an ambiguity or some
kind of language that was open to interpretation.  So this lease would
have to be revised or corrected to make sure that there wasn't any
ambiguity so that tenants knew exactly what was required under the
operating rent provision.
. . . .
Q.   Did there come a time when you discussed the Embreeville situation
with the Secretary?
A.   Yes, we did.  At some point in the winter of 2007, probably shortly after
this time[,] we had a meeting concerning Embreeville and to give him
an update concerning the status of that transaction, and I believe at
that meeting Brad [Swartz] and I or together . . . recommended that
we had an option for VisionQuest that we could allow the Wernersville
lease to expire . . . in accordance with its terms and that would open up
those buildings that we could use for VisionQuest.

(Doc. 30 at 217-18.)

10

Embreeville Center") near West Chester, Pennsylvania. (Hr'g Ex. D-15 at Lease

Agreement recitals para. 1; Doc. 23 at 271.) The Embreeville Center served as a

state hospital until it was decommissioned in 1997. (Doc. 23 at 267-68.) DPW leased

parts of the facility to various tenants from 1997 through 2005 but posted annual

operating losses in excess of $1 million each year. (Id. at 274.) By mid-2005, almost

all of the Embreeville Center's tenants except VisionQuest had vacated the

premises, and DPW and DGS began efforts to sell the property. (Id. at 273; Doc. 30

at 95-96.) The sale required VisionQuest to relocate, and its officers—along with

officials from DPW and DGS—commenced a search for alternate sites. (Doc. 23 at

274.)

Swartz collaborated with Ford Thompson ("Thompson"), who is the

executive assistant to the secretary of DPW, on the efforts to relocate VisionQuest.

(Doc. 23 at 265, 273; Doc. 30 at 55, 63-64.) In March 2006, VisionQuest considered

the feasibility of relocating to the Wernersville Hospital grounds. (Doc. 30 at 66;

Hr'g Ex. D-16.) Officials from DPW and VisionQuest examined the hospital

grounds,[10] (Doc. 23 at 279; Doc. 30 at 66, 93, 99), but VisionQuest initially eschewed the possibility due to the hospital's distance from Philadelphia, where most of its clients resided, (Doc. 23 at 271; Doc. 30 at 69-71; Hr'g Ex. D-18).  The following month, VisionQuest's president informed Thompson that he was "extremely concerned that [VisionQuest] will not locate an alternative facility prior to the timeline" for sale of the Embreeville Center, which VisionQuest believed was to occur by November 2006.  (Doc. 30 at 62,69; Hr'g Ex. D-2.)

In June 2006, VisionQuest solicited assistance from the Office of the Governor in a letter indicating that VisionQuest could have utilized the Wernersville Hospital were it not occupied by Firetree.  (Doc. 30 at 97-100; Hr'g Ex. D-4.)  VisionQuest also apprised DGS of its ongoing efforts in a July 2006 letter that stated:

> We recently concluded discussions with Firetree, Ltd.—which is leasing several buildings from the Commonwealth at Wernersville—after being told that one of those buildings was empty.  Firetree confirmed that it was leasing an empty 50,000 square foot building

---

[10]Thompson, Swartz, and Steven Squibb ("Squibb"), who is Swartz's subordinate, testified at the preliminary injunction hearing that officials from DPW and VisionQuest surveyed the buildings leased by Firetree.  Ertel offered rebuttal testimony that, according to visitor logbooks maintained by Firetree, no one representing either DPW or VisionQuest has ever inspected the buildings.  (Doc. 23 at 58; Doc. 30 at 250.)  The divergence between these superficially inconsistent testimonies could resolved by several explanations, including innocent neglect on the part of DPW and VisionQuest personnel to sign Firetree's logbooks.  Alternatively, they may have surveyed only the exterior of the buildings.  Firetree's personnel could also have permitted them to enter the premises without signing the logbooks.  The failure of the logbooks to reflect such a visit does not preclude it from having occurred, and the court finds credible defendant's evidence that DPW and VisionQuest officials evaluated Firetree's Wernersville facilities.

from the Commonwealth.  However, it was evaluating whether it
would have a future use for that building.  Firetree eventually
indicated that it found a use for the building and that it would not be
available for VisionQuest.

VisionQuest has also been in contact with Ford Thompson.  He
has proposed revisiting the feasibility of several state facilities that
were previously considered, including those in Norristown and
Wernersville.  Mr. Thompson was going to touch base with the
appropriate persons regarding these facilities[,] but I have yet to hear
back from him. . . .

* * * *

I hope you understand that we are being diligent in our search
for alternative sites.  I also want you to know that this letter only
covers our most recent efforts and is not an exhaustive review of
efforts that have spanned more than a year.

(Hr'g Ex. D-19.)

Thompson, Swartz, and others continued the search, and from spring

through autumn of 2006 narrowed it to three feasible options:  Allentown State

Hospital in Lehigh County, Norristown State Hospital in Montgomery County, and

Wernersville State Hospital.  (Doc. 23 at 270-75.)  They quickly removed Allentown

from consideration because it lacked essential facilities.  (Id. at 272)  The long-term

future of Norristown was uncertain (due to DPW's efforts to cease operations at

existing state hospitals), rendering it an undesirable location as well.  (Id.)  The

Wernersville Hospital grounds therefore emerged as the preferred site for

relocation of VisionQuest.  (Id. at 275.)  Thompson testified that by late 2006 DPW

had concluded "that the only reasonable option for us to relocate VisionQuest was

to use a building on the grounds of Wernersville."[11]  (Id. at 275.)  He suggested the

Wernersville site to the president and the general counsel of VisionQuest, and

described their reaction as follows:

> VisionQuest certainly indicated to me in different meetings I had with
> [its president and general counsel] that Wernersville was not their best
> option. . . .  [T]hey would prefer a location closer to Philadelphia[.
> A]nd my response to that was that at this point in time we don't have
> any other state option available to you any closer to Philadelphia.  So I
> think it's fair to say that . . . this was certainly not their most favored
> option, but it was the only one we had available and I think they
> understood that.

(Id. at 311.)  Thompson, through discussions with Swartz and VisionQuest officials,

identified Building 27 at the Wernersville Hospital as the facility that DPW would

---

[11]Firetree offered testimony from Ertel, who stated that Building 27 would
not satisfy VisionQuest's needs.  (Doc. 23 at 57.)  Although Ertel is generally familiar
with VisionQuest's programs, Thompson, Swartz, and Squibb stated that they
repeatedly discussed VisionQuest's operational needs with its officers during the
2005 and 2006 property search.  Individuals within VisionQuest and in continuous
contact with its officers are in the best position from which to judge whether
Building 27 would accommodate its needs.  The court credits the testimonial and
documentary evidence that corroborates the adequacy of Building 27 for
VisionQuest's programs.  (See, e.g., Hr'g Exs. D-4 & D-19.)

offer to VisionQuest.  (Id. at 275-78.)  Building 27 is one of the structures leased by

Firetree under its 2004 lease agreement.  (See Hr'g Ex. P-1 at recital para. 2.)[12]

## C.    Expiration of Firetree's Lease

By February 2007, both the VisionQuest search and the ambiguous Firetree

lease had ripened into exigent issues that demanded resolution by DGS.  The

Embreeville sale was of particular importance because of DPW's continued

---

[12]The parties have presented considerable testimony regarding precisely
which building on the Wernersville Hospital campus was identified as a potential
site for VisionQuest.  The dispute arises over the size of the building that
VisionQuest leased at the Embreeville Center and the comparable square footage of
various replacement options.  VisionQuest's space at the Embreeville Center
comprised approximately 81,000 square feet.  During the property search process,
DGS prepared draft leases for properties at both the Norristown and Wernersville
Hospitals.  The Norristown draft lease covers roughly 88,500 square feet, and the
Wernersville draft lease for Building 27 covers only 26,500 square feet.  (Hr'g Exs.
D-20 & D-21.)  Firetree also introduced Ertel's testimony that VisionQuest was
actually interested in Building 29 at the Wernersville Hospital.  Building 29 is one of
three contiguous buildings and houses a commercial kitchen and cafeteria.  (Doc. 23
at 55.)  It lacks facilities such as restrooms, dormitories, and counseling rooms that
are necessary to VisionQuest's residential programs.  (Id. at 55-56.)

Thompson explained these discrepancies.  They apparently arose from his
deposition testimony, during which he stated that DPW and DGS offered
VisionQuest a building that he identified as "the former mental retardation unit."
(Id. at 275-76.)  His custom is to identify buildings by their current or former use
rather than by number, and he mistakenly identified the mental retardation unit as
Building 29.  (Id. at 277, 298.)  It is, in fact, Building 27.  (Id. at 277.)  Thompson
further testified that the square footage set forth in the Embreeville lease was not
representative of VisionQuest's space requirements.  (Id. at 277, 299-300.)  In
recommending that VisionQuest be relocated to Building 27, Thompson relied on
the representations of VisionQuest's officers that Building 27 would satisfactorily
accommodate VisionQuest's programs.  (Id. at 278-79.)  The court credits
Thompson's testimony on this issue to the exclusion of Ertel's rebuttal.

operating losses and because State Senator Andrew Dinniman,[13] who represents

the senatorial district where the Embreeville Center is located, contacted Creedon

to express concern that the sale had not yet occurred.  (Doc. 23 at 208, 210, 282.)

Creedon scheduled a meeting on February 21, 2007 to address the delayed

sale of the Embreeville Center at which Phillips, Swartz, and Thompson were

present.[14]  (Id. at 208-09, 281; Doc. 30 at 114, 218; Hr'g Ex. D-13.) Ankabrandt did not

attend.  (Doc. 30 at 116.)  At the meeting Thompson informed Creedon that the

VisionQuest relocation had stalled the Embreeville sale and reiterated DPW's

recommendation that VisionQuest be transferred to the Wernersville Hospital.

(Doc. 23 at 282-83.)  Phillips and Swartz confirmed that Thompson's

recommendation was feasible in light of their preexisting decision to allow

Firetree's ambiguous lease to expire, and they suggested that DGS could implement

---

[13]Senator Dinniman's forename is not present in record and has been gleaned from the Pennsylvania State Senate website at http://www.pasen.gov/.

[14]Firetree asserts that this meeting is a figment of the collective imagination of Creedon, Swartz, Phillips, and Thompson, arguing that "the complete lack of any record of the alleged meeting raises considerable doubt as to the credibility of the testimony of witness as to what was discussed and decided at the meeting."  (Doc. 35 at 5-6.)  This argument is wholly specious.  These four witnesses were sequestered but nonetheless testified uniformly that the meeting occurred during either late February or early March of 2007.  (Doc. 23 at 208-09, 281; Doc. 30 at 114, 218.)  Creedon, Thompson, and Swartz recalled that other DGS personnel also attended, including Jordan Mark and Kathy Bertolet.  (Doc. 23 at 209, 281; Doc. 30 at 116.)  A scheduling notation from Swartz's email calendar confirms that the meeting occurred on February 21, 2007. (Doc. 30 at 114; Hr'g Ex. D-13.)  Creedon, Swartz, Phillips, and Thompson testified that they discussed the VisionQuest relocation and concluded that VisionQuest should be given a lease at Wernersville. The lack of additional documentation memorializing the meeting is simply insufficient to cast doubt on the credibility of these four witnesses.

Thompson's recommendation by declining to renegotiate Firetree's lease.  (Doc. 30

at 218.)  The attendees at the meeting agreed that this suggestion provided the most

efficient means for relocating VisionQuest and would allow the Embreeville sale to

proceed without further undue delay.  (Doc. 23 at 214, 263; Doc. 30 at 115, 219.)

Swartz transmitted a notice of non-renewal to Firetree on May 24, 2007, (Hr'g

Ex. P-7), and sent Thompson an confirmation email the following day that stated:

> Yesterday, DGS provided formal written notice to Firetree Limited
> that it was not renewing its lease at Wernerville [sic] State Hospital
> and that they must vacate the premises no later than March 21, 2008.[15]
> Therefore, if [DPW] and VisionQuest would like to relocate
> VisionQuest's facilities currently at Embreeville Center to Wernersville
> State Hospital in April of 2008, VisionQuest should request a lease
> through DPW to DGS.

---

[15]DGS has extended Firetree's lease pending disposition of the instant
motion.

(Hr'g Ex. P-34.)  In March 2008, DPW offered VisionQuest two lease choices:  a five-year lease of Building 27 at Wernersville State Hospital[16] or a one-year lease at Norristown State Hospital.  (Doc. 23 at 286-87, 303; Hr'g Ex. D-20 ¶ B.1; Hr'g Ex. D-21 ¶ B.1.)  VisionQuest had not made its choice at the time of the preliminary injunction hearing.  (Doc. 23 at 287.)

---

[16]DGS's failure to offer Firetree a lease of the remaining buildings appears to be the result of a classic communication breakdown.  Thompson testified that Creedon asked him during the late-February 2007 meeting whether DPW wanted VisionQuest to be offered property at the Wernersville Hospital.  (Doc. 23 at 282-83.)  Thompson replied that VisionQuest should be offered "the former mental retardation unit."  (Id. at 283.)  Based on his response, Creedon assumed that VisionQuest would lease all of the buildings formerly occupied by Firetree.  He testified that during the late-February 2007 meeting:

> [I]t was brought to my attention . . . that *the lease with Firetree at Wernersville* was set to expire in March of 2008.  I asked the question whether that would meet the needs potentially of a site for VisionQuest.  I was told yes from a timing perspective, and the decision was that *let's pursue . . . moving VisionQuest to Wernersville.*"

(Id. at 213 (emphases added)).  Phillips confirmed Creedon's interpretation, stating that she "left [the late-February 2007] meeting with the understanding that the secretary had given me the authority . . . to allow [Firetree's] Wernersville lease to expire of its own accord and that we could *use those buildings for VisionQuest if we needed those buildings.*"  (Doc. 30 at 219 (emphasis added)).  She also stated that DGS could have renegotiated Firetree's lease "if business conditions had changed or if an option came up that we didn't need" the premises for VisionQuest or another entity.  (Id. at 219.)

The issue of leasing the remaining Wernersville buildings did not surface until the summer of 2007 when the secretary of the Department of Corrections ("DOC") approached Creedon about the termination of Firetree's lease.  (Doc. 23 at 256.)  Creedon realized that there would be residual lease space and asked whether DOC would be interested in any buildings at Wernersville that were not utilized by VisionQuest.  (Id. at 75-76.)  The secretary of DOC expressed interest, and a lease was later prepared for all of Firetree's former buildings except Building 27.

D.     **Effect of the Non-Renewal**

Following Swartz's notice of non-renewal, Firetree informed the

Pennsylvania Department of Corrections ("DOC") that it would no longer offer

inmate services at the Wernersville Hospital and that DOC should relocate the 291

inmates it referred to Firetree.  (Id. at 74.)  The number of individuals housed in

Firetree's facilities at Wernersville dwindled to approximately sixty residents at the

time of the preliminary injunction hearing.  (Id. at 144.)  DOC presently has no

inmates placed in Firetree's Wernersville programs.  (Id. at 81-82.)

After DGS declined to renew Firetree's lease, Creedon offered, and DOC

accepted, a lease of all buildings formerly occupied by Firetree except Building 27.

(Id. at 79-81.)  DOC plans to operate in-house correctional services on the premises

similar to those formerly provided by Firetree.  (Id. at 80-84.)  It projects that

administering these services internally will save approximately $4.3 million during

the first operating year and $5.4 million in subsequent years compared to the

amounts it previously paid Firetree for similar services.[17]  (Id. at 77-80; Hr'g Exs. D-

8 & P-32 at 1.)  If Firetree receives a preliminary injunction, DOC will not resume

inmate referrals to Firetree's Wernersville programs because its budget for the

upcoming fiscal year does not cover the expense of Firetree's programs.  (Doc. 23 at

83-84, 103-04.)  An injunction would also require the DOC to find alternate

---

[17]The parties presented considerable testimony regarding the accuracy of
these projected savings.  (See, e.g., Doc. 23 at 125-36; Doc. 30 at 3-54.)  For purposes
of the instant motion, it is relevant only that DOC anticipates considerable savings
by operating in-house correctional programs at the Wernersville Hospital grounds.

accommodations for the 240 inmates that it plans to house its own programs at the Wernersville property.  (Id. at 84-85; Doc. 30 at 9-10, 27.)

### E.  Procedural History

Firetree commenced the instant suit on January 7, 2008 alleging that DGS refused to renew its lease in retaliation for Firetree's filing of an action with the Board of Claims.  Firetree alleges that the non-renewal violates its First Amendment right to petition the government for redress of grievances.[18]  It also filed the instant motion for a preliminary injunction to restrain DGS from allowing the lease to expire—and hence permitting it to remain seised of the Wernersville premises.  A hearing was held on the motion on March 27 and April 15, 2008, and supplemental briefing followed.  The parties have fully addressed the issues raised by the motion, which is presently ripe for disposition.

## II.  Discussion

The requirements for preliminary injunctive relief are well settled.  The moving party must establish that:  (1) there is a reasonable probability of success on the merits, (2) irreparable injury will result without injunctive relief, (3) granting the injunction will avoid a comparably greater injury than denying it, and (4) the injunction is in the public interest.  See BP Chems., Ltd. v. Formosa Chem. & Fibre

---

[18]Plaintiff's complaint also raises a claim for violation of its Fourteenth Amendment equal protection rights.  None of the parties' preliminary injunction briefs address this claim, nor did Firetree raise it at the preliminary injunction hearing.  Accordingly, the court presumes that Firetree does not request injunctive relief on the basis of the equal protection claim.

Corp., 229 F.3d 254, 263 (3d Cir. 2000); Merrill Lynch, Pierce, Fenner & Smith, Inc.

v. Chamberlain, 145 F. Supp. 2d 621, 625 (M.D. Pa. 2001).  While each factor need

not be established beyond doubt, they must combine to show the immediate

necessity of injunctive relief.  See Swartzwelder v. McNeilly, 297 F.3d 228, 234 (3d

Cir. 2002); see also Walgreen Co. v. Sara Creek Prop. Co., 966 F.2d 273, 275-79 (7th

Cir. 1992); 11A Charles Alan Wright et al., Federal Practice and Procedure

§ 2948.3 (3d ed. 1998).

### A.    Reasonable Probability of Success on the Merits

To establish a reasonable probability of success on the merits, the moving

party must produce sufficient evidence to satisfy the essential elements of the

underlying cause of action.  See Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir.

1980).  This requires examination of the legal principles controlling the claim and

potential defenses available to the opposing party.  See BP Chems., 229 F.3d at 264.

However, the mere possibility that the claim might be defeated does not preclude a

finding of probable success if the evidence clearly satisfies the essential

prerequisites of the cause of action.  Highmark, Inc. v. UPMC Health Plan, Inc., 276

F.3d 160, 173 (3d Cir. 2001) (citing 11A Wright et al., supra, § 2948.3).

In the matter *sub judice*, Firetree advances a claim for First Amendment

retaliation, actionable pursuant to 42 U.S.C. § 1983.  Section 1983 offers private

citizens a means to redress violations of federal law by state officials.  See 42 U.S.C.

§ 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

Id. Section 1983 is not a source of substantive rights, but merely a method to
vindicate violations of federal law committed by state actors. Kneipp v. Tedder, 95
F.3d 1199, 1204 (3d Cir. 1996). To establish a claim under this section, the plaintiff
must show a deprivation of a "right secured by the Constitution and the laws of the
United States . . . by a person acting under color of state law." Id. (quoting Mark v.
Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)). Creedon has stipulated that
all actions relevant to the instant matter were performed under the color of state
law. (Doc. 30 at 271.) Firetree therefore need only demonstrate that it was deprived
of its First Amendment rights.

The First Amendment protects citizens' right to petition the government for
redress of grievances by pursuing relief in court, see Anderson v. Davila, 125 F.3d
148, 161 (3d Cir. 1997), and requires that the right "be freely exercisable without
hinderance or fear of retaliation." Milhouse v. Carlson, 652 F.2d 371, 374 (3d Cir.
1981) (citations and internal quotation omitted). To state a prima facie claim of
First Amendment retaliation, the plaintiff must allege that: (1) the activity in
question is protected by the First Amendment, (2) the defendants responded with
retaliatory adverse action, and (3) the protected activity was a "substantial factor"
in causing the alleged retaliation. See Hill v. Borough of Kutztown, 455 F.3d 225,

22

241 (3d Cir. 2006); <u>see also</u> <u>Baldassare v. New Jersey</u>, 250 F.3d 188, 195 (3d Cir.

2001); <u>Chambers v. Pennsylvania</u>, Civ. A. No. 1:04-CV-0714, 2006 WL 3831377, at *7

(M.D. Pa. Dec. 28, 2006).  A defendant may rebut a prima facie case of retaliation by

showing that "the same adverse action would have taken place in the absence of the

protected conduct."  <u>Chambers</u>, 2006 WL 3831377, at *7; <u>see also</u> <u>Baldassare</u>, 250

F.3d at 194; <u>Nicholas v. Pa. State Univ.</u>, 227 F.3d 133, 144-45 (3d Cir. 2000).  Whether

the activity is protected is a question of law, while the remaining inquiries are

questions of fact.  <u>Hill</u>, 455 F.3d at 241.

### 1.    **Firetree's Prima Facie Case**

In the instant matter, Creedon does not dispute that the filing of Firetree's

Board of Claims action qualifies as a protected activity or that non-renewal of

Firetree's lease constitutes an adverse action.  (Doc. 19 at 13; Doc. 33 at 8.)  The

linchpin of Firetree's case is therefore whether its Board of Claims action was a

"substantial factor" in DGS's decision not to renew its lease.

To establish the causation element of a retaliation claim, a plaintiff must

prove that the exercise of the plaintiff's First Amendment rights motivated the

defendant to perform the retaliatory act.  <u>Ambrose v. Twp. of Robinson</u>, 303 F.3d

488, 493 (3d Cir. 2002); <u>Meenan v. Harrison</u>, Civ. A. No. 3:03-CV-1300, 2006 WL

1000032, at *4 (M.D. Pa. Apr. 13, 2006) (observing that plaintiff must demonstrate

that the exercise of First Amendment rights "played some substantial role" in

defendant's action).  However, a plaintiff need not prove that the retaliation was

impelled "solely or even primarily by the protected activity."  <u>Meenan</u>, 2006 WL

1000032, at *4; see also Mclaughlin v. Fisher, No. 05-4329, 2008 WL 1934457, at *7

(3d Cir. May 5, 2008) (reiterating that a retaliation claim requires merely that the

protected activity motivate the defendant's retaliatory action).  If a plaintiff meets

this burden, the defendant can rebut the claim of causation by showing that the

adverse action would have occurred "even in the absence of the protected conduct."

Baldassare, 250 F.3d at 194; Chambers, 2006 WL 3831377, at *7.  The United States

Court of Appeals for the Third Circuit has explicated the importance of a strict

interpretation of the causation requirement:

> A court must be diligent in enforcing these causation requirements
> because otherwise a public actor cognizant of the possibility that
> litigation might be filed against him, particularly in his individual
> capacity, could be chilled from taking action that he deemed
> appropriate and, in fact, was appropriate.  Consequently, a putative
> plaintiff by engaging in protected activity might be able to insulate
> himself from actions adverse to him that a public actor should take.

Lauren W. ex rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007).

The temporal proximity of a retaliatory act to a plaintiff's exercise of his First

Amendment rights is probative, but not dispositive, of the causation element of a

retaliation claim.  Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003).  As

the Third Circuit has stated:

> [I]t is causation, not temporal proximity itself, that is an element of
> plaintiff's prima facie case, and temporal proximity merely provides an
> evidentiary basis from which an inference can be drawn.  The element
> of causation, which necessarily involves an inquiry into the motives of
> [the state actor], is highly context-specific.  When there may be valid
> reasons why the adverse employment action was not taken
> immediately, the absence of immediacy between the cause and effect
> does not disprove causation.

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997).  For temporal proximity alone to establish causation, the time difference must be so short as to be "unusually suggestive of retaliatory motive."  Marasco, 318 F.3d at 512.  In the employment context, the Third Circuit has suggested that a temporal proximity of two days is alone sufficient to establish causation, see Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 & n.5 (3d Cir. 2000), while a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of wrongdoing on the part of the employer, Shellenberger v. Summit Bancorp., Inc., 318 F.3d 183, 189 (3d Cir. 2003).  This suggests that the difference in time must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence.

In the case *sub judice*, DGS received notice of Firetree's claim on January 18, 2007, which was a Thursday.  Ankabrandt recommended to Swartz and Phillips that Firetree's lease not be renewed on Monday, January 22.  Swartz and Phillips adopted the recommendation later that day, though they did not foreclose the possibility of renegotiating its terms.  This lapse of two business days (equivalent to four calendar days) coupled with Ankabrandt's November 2006 letter stating that the filing of an action would be a "serious factor" in DGS's renewal decision is sufficient to raise an inference of causation.  See Farrell, 206 F.3d at 279 n.5; see also Livingston ex rel. Livingston v. Borough of McKees Rocks, 223 F. App'x 84, 88 (3d Cir. 2007) (observing that "temporal proximity between [the protected activity and the adverse action] must be unusually suggestive before . . . a causal link" may

25

be inferred).  Firetree is therefore likely to establish a prima facie case of First

Amendment retaliation.

### 2.   DGS's Rebuttal Evidence

DGS may rebut Firetree's prima facie case by demonstrating that it would

have taken "the same adverse action . . . in the absence of the protected conduct."

Baldassare, 250 F.3d at 195; Chambers, 2006 WL 3831377, at *7 (noting that the

defendant may rebut a prima facie case of First Amendment retaliation by

proffering evidence that it would have performed identical actions notwithstanding

the plaintiff's exercise of First Amendment rights).  Testimony from DGS and DPW

officials depicted a property search that was underway for nearly a year prior to the

rent dispute with Firetree.  VisionQuest had evaluated the feasibility of relocating

to Wernersville and—though it may have preferred a property closer to

Philadelphia—had represented to DGS and DPW that the Wernersville Hospital

would suit its needs.  By mid-2006 VisionQuest had become "extremely concerned

that [it would] not locate an alternative facility prior to the [proposed] timeline" for

the sale of Embreeville.  (Hr'g Ex. D-2.)  VisionQuest underscored the urgent nature

of the search in a late-July letter to DGS that described search efforts and

reiterated that "[t]his letter covers our most recent efforts and its not an exhaustive

review of efforts that have spanned more than a year."  (Hr'g Ex. D -19.)  By the

time Firetree's rent issue arose in autumn 2006, DPW was already convinced that

relocation of VisionQuest to the Wernersville Hospital presented the "only

reasonable option" to effectuate sale of the Embreeville Center in a timely fashion. (Doc. 23 at 275.)

Firetree's rent dispute commenced amid this mounting pressure, and Ankabrandt, who lacked authority to decide whether to renew Firetree's lease, initially addressed the dispute on DGS's behalf.  Ankabrandt sent his November 2006 letter to Schranghamer to express DGS's concerns over the lease ambiguity. Phillips, who possessed authority to refuse to renew the lease, was unaware of this correspondence.  (Doc. 30 at 215.)  She and Swartz did not participate in Ankabrandt's initial discussions with Firetree representatives, but she independently accepted his recommendation that the lease not be renewed. Senator Dinniman questioned Creedon in early 2007, and Creedon called the late-February meeting in response.  At the meeting, Creedon, Phillips, Swartz, and Thompson collectively realized that they could resolve both the VisionQuest and Firetree issues by allowing Firetree's lease to expire and offering the premises to VisionQuest.  The laborious nature of the VisionQuest search provides weighty support for DGS's assertion that its predominant concern was to ascertain premises to which VisionQuest could be relocated.

The independent nature of the decision not to renew Firetree's lease is further supported by DPW's operational losses associated with the Embreeville Center.  Since 1997, DPW has experienced an annual operating loss of $1 million from that property.  By contrast, Firetree's four-year lease yielded a net total

27

benefit of approximately $1.15 million,[19] or $300,000 per year, all of which was

conferred in the form of upgrades to real property that were offset against general

rent under the lease.[20]   Hence, non-renewal of the lease will result in $300,000 in

---

[19]This figure derives from the general rent provisions of Firetree's lease, which permit it to offset the cost of improvements made to the premises against general rent obligations up to an aggregate amount of $1.6 million.  (Hr'g Ex. P-1 ¶ A.1.)  Ertel testified that Firetree has recouped all but approximately $450,000 of that allowance.  (Doc. 30 at 252.)  Hence, the net benefit to DPW, which owns the State Hospital, is approximately $1.15 million over the life of Firetree's lease.  The court acknowledges that these figures are merely estimates, but they are nevertheless sufficient to establish the net economic benefit of relocating VisionQuest to Wernersville to the exclusion of Firetree.

[20]Firetree has also asserted that the doctrine of promissory estoppel requires DGS to renew the lease because it has not yet recouped the full value of the offset.  In support of this assertion, Firetree relies exclusively upon a  March 2, 2004 email from Swartz to Ertel in which Swartz stated that "it is the intent of [DGS] to continue this lease until, at minimum, the $1.6 million in improvements to [sic] are fully amortized."  (Hr'g Ex. P-36.)  Firetree's argument fails for at least two reasons.  First, it is predicated upon Firetree's contractual rights rather than upon First Amendment doctrine.  It therefore adds little to Firetree's retaliation case and is strongly outweighed by DGS's evidence that it terminated Firetree's lease as a result of the VisionQuest search.  Second, Firetree may not invoke the doctrine of promissory estoppel to enforce representations made before the parties executed the contract. Domino's Pizza v. Deak, No. Civ. A. 3:05-456, 2007 WL 916896, at *6 (W.D. Pa. Mar. 23, 2007)  ("If courts permitted promissory estoppel claims based on representations made during the negotiations for integrated contracts, then there would be little point in enforcing a rule that protects a completely integrated written contract from being varied or contradicted by extraneous evidence." (internal citations omitted)).  Swartz' email, sent prior to execution of the contract on March 22, 2004, constitutes parol evidence and therefore is not a promise upon which Firetree may rely.  See DL Res., Inc. v. FirstEnergy Solutions Corp., 506 F.3d 209, 222 (3d Cir. 2007) (quoting Galmish v. Cicchini, 734 N.E.2d 782, 788 (Ohio 2000)) ("The parol evidence rule states that absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.").

forgone revenue to avoid an annual $1 million loss, a trade-off eminently reasonable from the perspective of DPW's balance sheet.[21]

Finally, Firetree faults DGS's disavowment of retaliatory motive because DGS failed to obtain a lease commitment from VisionQuest prior to providing notice of non-renewal to Firetree and because DGS arbitrarily favored VisionQuest over Firetree. With regard to the former argument, Swartz testified that DGS does not customarily offer to lease a property unless the property is unencumbered by other lease agreements:

> Q.    [A]s of the time the notice of nonrenewal had gone out to Firetree, there had not been any agreement or commitment by VisionQuest to take property at Wernersville, is that right?
>
> A.    That is correct, but you have to understand you would not encumber a new property with a new tenant until you sent your notice of nonrenewal. I would not have wanted an existing lease [in favor of] one entity while another [entity] is still there.

(Id. 165-66.) After transmitting a notice of non-renewal to Firetree, Swartz promptly informed Thompson that the Wernersville Hospital was available for VisionQuest, and a lease offer was extended. DGS's failure to obtain a lease commitment from VisionQuest therefore does not demonstrate retaliatory motive.

The allegation of favoritism is similarly unavailing because Firetree and VisionQuest occupy different positions vis-à-vis DPW, which owns both the Embreeville Center and the Wernersville Hospital. DPW is directly responsible for

---

[21]Ertel testified that, after exhaustion of the offset, Firetree will pay approximately $500,000 in annual general rent. (Doc. 23 at 62.) This estimate has no effect on the reasonableness of the decision not to renew Firetree's lease in order to avoid a loss roughly twice the amount of Ertel's projected rent payments.

29

developing, regulating, and overseeing juvenile rehabilitation programs such as

those operated by VisionQuest.  See 42 PA. CONS. STAT. § 6327(a), (f).  It has no such

obligation for Firetree's programs, which fall within DOC's jurisdiction.  See id. §

9903 para. 4.  DPW's statutory obligation to regulate VisionQuest's programs

provides DGS and DPW with a valid, non-retaliatory reason for granting

preferential treatment to VisionQuest in leasing space at the Wernersville

Hospital.[22]

In summation, Firetree is likely to establish a prima face case of First

Amendment retaliation.  DGS, however, has offered persuasive evidence that it

would have declined to renew the lease notwithstanding Firetree's protected

---

[22]Firetree also attempts to establish retaliatory motive by reference to a list
prepared by DGS that purports to identify all lawsuits filed by Firetree and a sister
corporation, known as New Foundations, against the Commonwealth.  (Doc. 35 at
10.)  DGS distributed the list, entitled "Allen Ertel Litigation against the
Commonwealth," at a February 2008 gathering of state legislators concerned about
the loss of approximately 150 jobs associated with the closure of Firetree's
Wernersville operations.  (Doc. 23 at 250; Hr'g Ex. P-13.)  Firetree asserts that DGS
prepared the list as a justification for its refusal to renew the Wernersville lease, but
Firetree failed to produce any evidence in support of its position.  To the contrary,
Creedon explained that DGS was attempting to "work out some type of resolution"
to all of the suits brought by Firetree and New Foundations.  (Doc. 23 at 251.)  The
list was presented to the legislators to portray "the full scope of the disagreements
. . . with Mr. Ertel" and to explain that the number of disputes with him made a
facile resolution of all of them difficult to reach.  (Id. at 251-52.)  Swartz, who also
attended the February 2008 gathering, indicated that the list "was handed out at
the meeting" but that "there was very little discussion" about it.  (Doc. 30 at 165.)
Firetree has offered no testimony from any other individual present at the meeting
to describe how DGS used the list or the purpose for which it was presented.
Absent such testimony, the court concludes that the list was simply provided to aid
the gathered legislators in understanding the difficulty associated with a global
resolution of all claims brought by Firetree and New Foundations.

activity.  DGS will likely prove that it refused renewal to ensure that premises were available for the relocation of VisionQuest, which enabled DPW to sell the Embreeville Center, thereby eliminating a loss-producing asset.  DGS is equally likely to demonstrate that none of its actions were performed with a retaliatory motive against Firetree, which has failed to demonstrate a likelihood of success on the merits.

### B.   Irreparable Injury

Irreparable injury is harm of such an irreversible character that prospective judgment would be inadequate to make the moving party whole.  See Anderson, 125 F.3d at 163; Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989).  The mere risk of injury is not sufficient to meet this standard.  Rather, the moving party must establish that the harm is imminent and probable. Anderson, 125 F.3d at 164; 11A WRIGHT ET AL., supra, § 2948.1.  Harm that may be contained effectively only through immediate injunctive relief is properly deemed "irreparable."  Instant Air Freight, 882 F.2d at 801.

In the instant matter, Firetree argues three forms of irreparable harm.  First, it alleges that DGS's non-renewal of its lease has a chilling effect on its exercise of First Amendment freedoms.  Second, it avers that without an injunction it will suffer harm to its goodwill, reputation, and business opportunity, and that it will be forced to layoff competent and qualified staff members whom it may later be unable to rehire.  Finally, it contends that the Commonwealth's Eleventh Amendment

immunity and state actors' qualified immunity render it unable to recover monetary damages for its alleged injuries.  The court will address these issues *seriatim*.

### 1.    <u>Chilling Effect on First Amendment Freedoms</u>

Firetree alleges that defendant's actions have chilled its First Amendment rights as well as those of its sister corporation, New Foundations.  "The loss of First Amendment freedoms even for minimal periods of time, unquestionably constitutes irreparable injury."  <u>See</u> <u>Anderson</u>, 125 F.3d at 164 (quoting <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976)).  To obtain injunctive relief, however, a plaintiff must show that a defendant's actions threaten a "chilling effect" on its exercise of those rights.  <u>See</u> <u>Hohe v. Casey</u>, 868 F.2d 69, 72-73 (3d Cir. 1989).  The plaintiff must demonstrate that the defendant's actions create a "real or immediate danger" that the plaintiff will be dissuaded from exercising First Amendment rights "in the near future."  <u>Conchatta, Inc. v. Evanko</u>, 83 F. App'x 437, 442 (3d Cir. 2003); <u>Anderson</u>, 125 F.3d at 164 (observing that a party seeking injunctive relief must establish the existence of a danger of recurrent infringement of its rights).  Injunctive relief is appropriate only if an injury to First Amendment rights is "both threatened and occurring at the time of [the plaintiff's] motion."  <u>Conchatta</u>, 83 F. App'x at 442 (quoting <u>Elrod</u>, 427 U.S. at 374).

In the case *sub judice*, Firetree claims that DGS chilled its First Amendment rights through:  (1) issuance of Ankabrandt's November 2006 letter and (2) the refusal to renew its lease.  The circumstances of the instant case, however,

demonstrate that neither of these actions had a chilling effect on Firetree's exercise of First Amendment rights.

First, Ankabrandt's November 2006 letter did not have a chilling effect on Firetree's First Amendment rights because it preceded both the alleged protected activity (the Board of Claims action) and the adverse action (the non-renewal of its lease). It is therefore logically impossible that Ankabrandt's letter was sent in retaliation for Firetree's exercise of its First Amendment rights. Further, the context in which Ankabrandt sent the letter lacks indicia of retaliation. Ankabrandt informed Schranghamer that a Board of Claims action would confirm the existence of a lease ambiguity, preventing DGS from renewing the lease in its then-existing form. Ankabrandt's letter has no chilling effect on Firetree's rights because it is simply a statement of DGS's intent not to maintain an ambiguous lease.

Second, DGS's refusal to renew Firetree's lease will have no *imminent* chilling effect on Firetree's ability to seek legal redress in the future. Firetree currently has only one lease with DGS, which is the Wernersville lease incident to the instant action. (Doc. 30 at 130.) It is not negotiating to purchase real property from DGS, nor does it have any outstanding real estate bids. (Id. at 130-31.) New Foundations similarly has no leases, ongoing negotiations, or outstanding bids with DGS. (Id.) Therefore, neither Firetree nor New Foundations have any interest susceptible to future retaliation by DGS.

Allen Ertel ("Ertel"), chairman of Firetree's executive committee, testified that non-renewal of Firetree's lease dissuaded New Foundations from filing an action arising from the alleged breach of its contract for the acquisition of certain state-owned property in Philadelphia.  According to Ertel, the property at issue was conveyed to a third party in violation of public bidding statutes.  (Doc. 23 at 138-40, 179-90.)  He testified that New Foundations forbore from instituting a suit "because we [(Firetree)] got all these other contracts with the state, and we get cut off and we're stuck with that."  (Id. at 140.)

Ertel's testimony is insufficient to establish any chilling effect on Firetree's First Amendment rights.  As a threshold matter, the court notes that DGS declined to renew Firetree's lease prior to New Foundations' decision not to file suit.  However, Firetree had no legal relationship susceptible to future retaliation by DGS at the time of New Foundations' forbearance.  Although Firetree may harbor some concern regarding the future of its relationship with DGS, this general angst does not meet the definition of an imminent chilling effect on Firetree's First Amendment rights.  Second, Ertel failed to make any causal connection between *New Foundations'* purported claim and *Firetree's* existing contracts with Commonwealth agencies.  His vague assertion of fear is woefully inadequate to constitute a true chilling effect on the exercise of First Amendment rights.  See Anderson, 125 F.3d at 164 (observing that issuance of injunction requires "real or immediate danger" that the plaintiff will be dissuaded from exercising First Amendment rights "in the near future"); see also Grimm v. City of Uniontown, No.

34

Civ. A. 06-1050, 2008 WL 282344, at *25 (W.D. Pa. Jan. 31, 2008) (granting summary judgment in favor of defendants on plaintiff's First Amendment retaliation claim after plaintiff alleged that defendants relayed information to a third party, who committed the allegedly adverse activity upon which plaintiff predicated his claim).

Firetree and New Foundations are sophisticated entities cognizant of their legal rights and unlikely to be rebuffed from pursuing future court actions. See Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ., 11 F. Supp. 2d 1192, 1198 (C.D. Cal. 1998) (noting that, in suit brought by public school teachers seeking to enjoin the opening of school board meetings with an invocation, that the sophistication, background, and education of the plaintiffs is a relevant factor when considering whether the plaintiffs will suffer irreparable harm justifying issuance of an injunction).  The demand amount in Firetree's Board of Claims action is approximately $75,000.[23]  (Doc. 30 at 133.)  In sharp contrast, Firetree and New Foundations have collectively commenced at least eighteen suits against the Commonwealth of Pennsylvania since 2004, one of which advances a claim of $60 million.  (Hr'g Ex. P-13.)  At least two currently pending actions against DGS also involve claims for several million dollars.  (Doc. 30 at 130-34.)  These lawsuits provide ample proof that Firetree and New Foundations are not wilting violets when it comes to litigation and that the adverse circumstances of the Wernersville

---

[23]The Board of Claims docket indicates that the precise amount is $75,313.41.

lease will not have a chilling effect on the continued exercise of their First
Amendment rights.

### 2.      **Irreparable Harm to Business Interests**

Firetree next contends that without an injunction it will suffer irreparable
harm to its economic and competitive interests.  It alleges that without an
injunction its goodwill, reputation, and business opportunity will be damaged.  It
will also lose qualified and competent staff members, exacerbating its irreparable
harm.

Damage to a plaintiff's good will, reputation, or business opportunity
constitutes irreparable harm only in cases involving trademark infringement and
unfair competition.  Acierno v. New Castle County, 40 F.3d 645, 654 (3d Cir. 1994).
Injuries associated with these type of cases have a particularly strong likelihood of
confusing consumers' perceptions of competing products and can have lasting
effects on an injured plaintiff's market share.  See Pappan Enters. v. Hardee's Food
Sys., 143 F.3d 800, 805 (3d Cir. 1998).  Courts recognize damage to goodwill,
reputation, and opportunity as irreparable harm in this context to avoid these
lasting injuries.

Cases outside of trademark infringement and unfair competition, by contrast,
present no risk of lasting harm to a plaintiff's goodwill or reputation.  In these cases,
such injuries to goodwill, reputation, and business opportunity are nothing more
than "economic loss, [which] does not constitute irreparable harm."  Acierno, 40
F.3d at 654 (observing that harm to goodwill and business reputation was

36

insufficient to establish irreparable harm in case in which real estate developer

alleged deprivation of constitutional rights as a result of denial of building permit);

see also IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc., 250 F. App'x 476, 479 (3d

Cir. 2007) (finding that damages to goodwill failed to establish irreparable harm in a

case in which plaintiff's harm was "not analogous to the harm caused by consumer

confusion").  In the instant matter, Firetree's alleged harm to goodwill, reputation,

and business opportunity do not implicate the "special problem of confusion that

exists in cases involving trademark infringement and unfair competition." Acierno,

40 F.3d at 654.  These harms are therefore economic in nature and are compensable

through monetary relief.

It also contends that loss of personnel constitutes irreparable injury.

However, any such loss is likewise compensable through monetary recovery and

will not support injunctive relief.  See Instant Air Freight, 882 F.2d at 801-02

(holding that alleged damage to the plaintiff's seventy employees and to "everything

[that the plaintiff] ha[d] built over the past two decades" was insufficient to

establish the existence of irreparable harm); see also Adams v. Freedom Forge

Corp., 204 F.3d 475, 484 (3d Cir. 2000) (holding in a case under the Employee

Retirement Income Security Act that "financial distress suffered by employees

whose wages have been terminated" does not qualify as irreparable harm to the

employer upon which a preliminary injunction may issue).  Accordingly, Firetree

has failed to establish irreparable harm to its economic interests.

37

**3.     Irreparable Harm Resulting from Immunity of the Commonwealth and its Employees**

Firetree lastly contends that it will suffer irreparable injury because a suit for damages is unlikely to succeed due to the Commonwealth's Eleventh Amendment immunity and the qualified immunity to which Commonwealth employees may be entitled.  A state's Eleventh Amendment immunity from suits for damages renders a suit at law inadequate to compensate a plaintiff for injuries inflicted by the state. See Temple Univ. v. White, 941 F.2d 201, 215 (3d Cir. 1991) (holding that the plaintiff's sole avenue of recovery was equitable in nature because the defendant possessed sovereign immunity); Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. County, 893 F. Supp 301, 309 (D.N.J. 1995) ("Where the Eleventh Amendment bars recovery of monetary damages from state entities, legal remedies are inadequate and the plaintiff has shown the irreparable harm necessary for injunctive relief.").  The qualified immunity available to state officials who are defendants may also cause a plaintiff's remedy at law to become inadequate, provided that there is a likelihood that immunity would be conferred at trial.  See Blum v. Schlegel, 830 F. Supp. 712, 725-26 (W.D.N.Y. 1993) (holding that a plaintiff's remedies at law were inadequate because individual defendants would likely have been entitled to qualified immunity in the context of the dispute at issue).

In the instant matter, the Commonwealth would unquestionably possess Eleventh Amendment immunity on a claim for damages arising from the non-

38

renewal of Firetree's lease.  <u>See</u> <u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44, 54

(1996) ("[F]ederal jurisdiction over suits against unconsenting States was not

contemplated by the Constitution when establishing the judicial power of the

United States." (internal quotations omitted)).  Firetree could also advance a similar

suit against Creedon and other potential individual defendants (hereinafter "the

hypothetical individual defendants"), who would assert qualified immunity in

response.  Qualified immunity shields officials for performance of "discretionary

functions," if their conduct did not violate a "clearly established statutory or

constitutional right[] of which a reasonable person would have known."  <u>Wilson v.

Layne</u>, 526 U.S. 603, 609 (1999); <u>see also</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001).

It requires a two-step inquiry in which the court first determines whether "the

[defendant's] conduct violated a constitutional right."  <u>Saucier</u>, 533 U.S. at 201.  A

defendant who violated constitutional rights will nevertheless be immune from

liability if the right was not "clearly established," such that a reasonable person in

the defendant's position could have believed he or she was acting in a lawful

manner.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).[24]

Assuming *arguendo* that Firetree were to establish that the hypothetical

individual defendants violated its First Amendment rights, the defendants would

argue that they nevertheless acted reasonably in light of their long-term efforts to

relocate VisionQuest.  The Wernersville Hospital supplied a feasible site for this

purpose, and VisionQuest had confirmed the adequacy of the State Hospital's

facilities for its programs.  Non-renewal of Firetree's lease was an objectively

reasonable attempt to assist VisionQuest.  Such an argument has a reasonable

likelihood of success, and the defendants are likely to be entitled to qualified

immunity against any claim Firetree might bring against them in their individual

capacities.

Firetree has therefore established that the Commonwealth's sovereign

immunity and government officials' qualified immunity may render it unable to

recover damages for its alleged First Amendment injuries.  However, the

---

[24]In Blum v. Schlegel, 830 F. Supp. 712 (W.D.N.Y. 1993), the court evaluated
whether a plaintiff seeking a preliminary injunction could rely on a state actor's
qualified immunity to establish the inadequacy of remedy at law.  The court rather
astutely noted that reliance on qualified immunity in the First Amendment context
results in an inherent contradiction.  The plaintiff must argue "on the one hand that
defendants did not violate clearly established statutory or constitutional rights . . . ,
and on the other hand claim[] that defendants violated his right . . . to free speech,
which, of course [is] clearly established."  Id. at 725.  Nevertheless, the court
concluded that the facts of particular First Amendment cases may warrant
application of qualified immunity.  Id.  Any injury suffered from the conduct of
immune defendants constitutes "irreparable harm" supporting issuance of a
preliminary injunction.  Id. at 725-26.

unlikelihood of Firetree's success on the merits of a First Amendment claim, <u>see</u> <u>supra</u> Part II.A.2, vitiates this risk.

Accordingly, the court finds that Firetree has failed to establish any significant risk of irreparable harm in the form of a chilling effect on its First Amendment rights or a non-compensable impairment of its economic and business interests.

### C.     Balancing of Hardships

Whether granting injunctive relief would result in greater harm than denying it requires an examination of the terms of the proposed injunction, the respective positions of the parties, and some well-educated speculation on the possible effects of the injunction.  <u>See</u> <u>Novartis Consumer Health, Inc. v. Johnson & Johnson-</u> <u>Merck Consumer Pharms. Co.</u>, 290 F.3d 578, 596-97 (3d Cir. 2002); <u>Pittsburgh</u> <u>Newspaper Printing Pressmen's Union No. 9 v. Pittsburgh Press Co.</u>, 479 F.2d 607, 609-10 (3d Cir. 1973).  If the potential harms to others exceed the potential benefits to the movant, injunctive relief should generally be denied.  <u>See</u> <u>Novartis Consumer</u> <u>Health</u>, 290 F.3d at 596-97.  Essentially, the question is whether the injunction would do more harm than good.

In the case *sub judice*, the court finds that the potential harm an injunction would cause to DGS, DPW, and DOC outweighs the harm that Firetree will incur by denial of one.  The Wernersville Hospital property is an appropriate a place for the relocation of VisionQuest.  An injunction would likely prolong VisionQuest's occupancy at the Embreeville Center, stalling the sale and resulting in continued

41

operating losses to DPW at a rate of $1 million per year.  An injunction would also

emasculate DOC's plan to operate a 240-inmate community corrections center at

the Wernersville Hospital.  DOC would have to arrange alternate housing facilities

for these inmates at a cost in excess of its budgeted appropriations, thus exposing

its inmates to overcrowding and lengthened waiting lists for assignment to

community correctional centers.

The harm that Firetree would suffer by denial of the injunction would be

relatively minimal in comparison.  Firetree's Wernersville facility presently houses

a mere sixty inmates who have to be either relocated or returned to their referring

institutions.  Transfer of these inmates presents a far less burdensome task than

that which would face DOC if Firetree received an injunction.  Additionally, closure

of Firetree's Wernersville center would not impair continued operation of its

numerous other facilities throughout central and eastern Pennsylvania.  Therefore,

the courts finds that the harm an injunction would cause to DGS, DPW, and DOC

outweighs that which Firetree would avoid by its denial.

### D. **Public Interest**

Among the more nebulous concepts of equitable relief is the public interest

factor of the injunction analysis.  11A WRIGHT ET AL., supra, § 2948.4.  This factor

requires the court to look beyond the parties to gauge the injunction's potential

effects on the community as a whole.  See Novartis Consumer Health, 290 F.3d at

596-97.  Public policies favoring enforcement of statutory and contractual

obligations constitute relevant considerations in this analysis.  See id.; United

42

States v. Ingersoll-Rand Co., 320 F.2d 509, 524 (3d Cir. 1963).  However, specific,

tangible effects on third parties should be the focus of the court's determination.

See Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 883-84 (3d Cir.

1997); Ingersoll-Rand Co., 320 F.2d at 524.

In the matter *sub judice*, the court finds that the public interest is served by

the denial of injunctive relief.  An injunction would effect an inmate housing

problem for DOC, continued operating losses for DPW, and renewed search efforts

for DGS, DPW, and VisionQuest.  It would also nullify the savings that DOC expects

to realize by operating an in-house community corrections center at the

Wernersville Hospital.  These expenses would be exacted from the public coffers of

state agencies.  Denial of the injunction would allow DOC and DPW to experience

significant cost savings while merely requiring Firetree to relocate approximately

sixty inmates.  Denial also ensures the availability of premises for the relocation of

VisionQuest.  The court concludes that the public interests favors denial of the

injunction to enable the state to realize these various benefits.

## III.   Conclusion

Evaluating a request for a preliminary injunction requires consideration of

the totality of all factors that contribute to the analysis.  This analysis confers

particular attention on the irreparable nature of the harm involved and the

likelihood of success on the merits.  See NLRB v. Electro-Voice, Inc., 83 F.3d 1559,

1568 (7th Cir. 1996) ("The more likely the plaintiff is to win, the less heavily need the

balance of harms weigh in his favor."); see also Iseley v. Dragovich, 236 F. Supp. 2d

43

472, 474 (E.D. Pa. 2002) (observing that a court need not consider the balancing of hardships and public interest when the first two factors of the injunction analysis counsel against an award of injunctive relief); <u>Laidlaw, Inc. v. Student Transp. of Am., Inc.</u>, 20 F. Supp. 2d 727, 769 (D.N.J. 1998).

In the present matter, Firetree has failed to demonstrate a likelihood of success on the merits.  It has failed to demonstrate any significant risk of irreparable harm.  The balance of the harms and the public interest confirm that denial of the injunction provides the appropriate disposition for Firetree's motion.

An appropriate order follows.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      May 15, 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FIRETREE, LTD,** | : | **CIVIL ACTION NO. 1:08-CV-0245** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JAMES CREEDON,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

AND NOW, this 15th day of May, 2008, upon consideration of the motion for a preliminary injunction (Doc. 2), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion is DENIED.


                                          __S/ Christopher C. Conner__
                                          CHRISTOPHER C. CONNER
                                          United States District Judge